SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United

States of America, acting through the United States Department of Justice and on behalf

of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human

Services ("HHS"), the Department of Defense's Defense Health Agency ("DHA") on

behalf of the TRICARE program, the United States Office of Personnel Management

("OPM"), which administers the Federal Employees Health Benefits Program

("FEHBP") (collectively, "the United States"), EndoGastric Solutions, Inc. ("EGS"), and

Glenn Schmasow ("Relator") (hereafter collectively referred to as "the Parties"), through

their authorized representatives.

RECITALS

A.     EGS is a medical technology company headquartered in Redmond,

Washington that, at all relevant times herein, developed, manufactured, distributed,

marketed, and sold a product known as EsophyX that is used to treat gastroesophageal

reflux disease ("GERD") by reconstructing the gastroesophageal valve.  EsophyX is

inserted using an endoscope through a procedure known as a Transoral Incisionless

Fundoplication ("TIF"), which is typically suitable for a hospital outpatient setting.  This

procedure was developed as an alternative to other more invasive procedures such as the

Laparoscopic Nissen Fundoplication ("Lap Nissen"), which requires incisions in the

abdomen.

B.     On June 26, 2012, Glenn Schmasow filed a *qui tam* action in the United

States District Court for the District of Montana captioned *United States ex rel. Glenn

Schmasow v. EndoGastric Solutions, Inc.*, No. 1:12-cv-00078, pursuant to the qui tam

Exhibit 1

provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the Civil Action). The Civil Action alleges that EGS knowingly caused false claims to be submitted by providers for TIF procedures using incorrect diagnosis or procedure codes and that EGS knowingly offered and paid illegal remuneration to certain physician and hospital providers for participating in patient seminars and co-marketing arrangements with the intent to induce them to use EsophyX.

      C.     The United States contends that EGS caused to be submitted claims for payment to the Medicare Program (Medicare), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1, and to the Medicaid Program (Medicaid), 42 U.S.C. §§ 1396-1396w-5. The United States further alleges that EGS caused claims for payment to be submitted to the TRICARE Program, 10 U.S.C. §§ 1071-1110b; and the FEHBP, 5 U.S.C. §§ 8901-8914

      D.     The United States contends that it has certain civil claims, as specified in Paragraph 7, against EGS for engaging in the following conduct during the period January 1, 2007 through June 30, 2011 (hereinafter referred to as the "Covered Conduct"):

> (1) EGS knowingly caused providers to submit claims for TIF procedures using incorrect diagnosis or procedure codes, including codes such as 43280 that is intended for the Lap Nissen procedure; and (2) EGS knowingly offered and paid illegal remuneration to certain physician and hospital providers for participating in "patient seminars" and "co-marketing arrangements" in a manner intended to induce them to use EsophyX in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

As a result of the foregoing conduct, the Government alleges that EGS knowingly caused false or fraudulent claims to be submitted to, or caused purchases by, Medicare and other Federal Health Care Programs.

E.      This Settlement Agreement is neither an admission of liability by EGS nor a concession by the United States that its claims are not well founded.

F.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorney's fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.      The following payments identified in subparagraphs (a) and (b) below are hereinafter referred to as the Settlement Amount and shall be made to the United States by electronic funds transfer pursuant to written instructions to be provided by the Department of Justice:

a.      EGS shall pay to the United States $2,500,000 in fixed payments ("Fixed Settlement Amount") plus interest accrued thereon at the rate of 3.25% per annum in accordance with the payment schedule attached hereto as Exhibit A.  On the Effective Date of this Agreement, this sum shall constitute a debt due and immediately owing to the United States.  The entire balance of the Fixed Settlement Amount, or any portion thereof, plus any interest accrued on the principal as of the date of any prepayment, may be prepaid without penalty.

b.      In the event that a specific code for TIF procedures is included in an annual version of the Current Procedural Terminology ("CPT") manual within five (5) years of the Effective Date, EGS shall also pay to the United States additional payments

3

not to exceed $2,750,000 as set forth in this subparagraph ("Contingency Settlement Amount"). EGS's obligation to make payments toward the Contingency Settlement Amount will take effect on the next January 1 after the date such a CPT code is first published ("Target Date"). No later than seven (7) calendar days after the Target Date, EGS will notify the United States of the Target Date. EGS shall calculate Contingency Settlement Amount payments annually for each of the five annual revenue years following the Target Date. EGS shall submit payments and documentation supporting the payment amount to the United States on March 15 of each year following the year for which annual revenues were calculated. If March 15 falls on a Saturday or Sunday, EGS shall submit the payment and supporting documentation to the United States on the following Monday. The amounts owed shall be calculated as follows:

> (i) if EGS's annual revenues exceed $20 million but are less than $30 million, EGS shall pay 2% of the revenues above $20 million but below $30 million; and

> (ii) if EGS's annual revenues exceed $30 million, EGS shall pay amounts due in (i) above plus 5% of that portion of revenues that exceeds $30 million.

EGS shall have no obligation to pay the Contingency Settlement Amount after the earliest of: (A) the total of all such payments made under this Paragraph equals $2,750,000; (B) March 16 of the year in which the Fifth anniversary of the Target Date occurs; or (C) March 16, 2024 ("Contingent Payment Termination Date").

     2.     Unless otherwise agreed upon in writing, in the event that an EGS Sale Event or an EsophyX License Event (both as defined below) closes on or before the Contingent Payment Termination Date, the proceeds of that Event shall immediately be

due and owing to the United States, and shall be paid to the United States within 7

calendar days of the Event, as follows:

      a.    First, EGS shall pay to the United States the total of all Fixed
            Settlement Amount payments remaining to be paid pursuant to
            subparagraph 1(a), above;

      b.    Second, EGS shall pay to the United States an additional
            $2,750,000 less any payments made toward the Contingency
            Settlement Amount;

Payments made pursuant to this Paragraph 2 shall satisfy and extinguish any obligation of

EGS to make further payments to the United States under this Settlement Agreement.

For purposes of this Paragraph 2, the following definitions shall apply:

    "EGS Sale Event" shall mean (i) any reorganization, merger or consolidation in

which the voting securities of EGS outstanding immediately preceding such transaction

represent less than 50% of the voting power of EGS or surviving entity following such

transaction, or (ii) the sale of all or substantially all of the assets of EGS.

    "EsophyX License Event" shall mean the grant of one or more licenses to, or

assignment of, all or substantially all of the intellectual property rights related to

EsophyX excluding any license that is limited to distribution, reseller, marketing,

promotion or similar rights.

    3.    If, prior to the Contingent Payment Termination Date, EGS is prepared to

enter into and consummate an EGS Sale Event or an EsophyX License Event to generate

revenue solely for purposes of supporting operations, then EGS may submit a request to

the counsel for the United States for waiver of the obligations in Paragraph 2 with respect

to that transaction. The United States may waive EGS's obligations under paragraph 2 as

to any particular transaction consummated before the Contingent Payment Termination

Date that the United States deems, in its sole discretion, reasonably would increase the likelihood that EGS would be able to meet its obligations under Paragraph 1.

4.      In the event EGS fails to pay any part of the Settlement Amount as provided in Paragraphs 1 and 2 and Exhibit A, within seven (7) calendar days of the date upon which each payment is due, EGS shall be in Default of its payment obligations ("Default"). The United States will provide a written Notice of Default, and EGS shall have an opportunity to cure such Default within seven (7) calendar days from the date of receipt of the Notice of Default. Notice of Default will be delivered to Jonathan Diesenhaus, Esq., Hogan Lovells US LLP, 555 Thirteenth Street, N.W., Washington D.C. 20004, or to such other representative as EGS shall designate in advance in writing. If EGS fails to cure the Default within seven (7) calendar days of receiving the Notice of Default, the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on EGS's share of the Fixed Settlement Amount shall thereafter accrue at the rate of 10% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance). In the event of Default, EGS agrees to pay the United States all reasonable costs of collection and enforcement of this Agreement, including attorneys' fees and expenses.

5.      Conditioned upon the United States receiving the Settlement Amount payments from EGS, the United States agrees that it shall pay to Relator by electronic funds transfer 18 percent of each such payment received under the Settlement Agreement as soon as feasible after receipt of the payment.

6.      EGS shall pay to Relator $50,000.00 for reasonable expenses, costs and attorney's fees no later than fourteen (14) days from the date this Agreement is signed by all parties ("Effective Date").

7.      Subject to the exceptions in Paragraph 12 (concerning excluded claims) below, and conditioned upon EGS's full payment of the Settlement Amount, and subject to Paragraph 25 below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), the United States releases EGS together with its current or former direct or indirect parent and member corporations; divisions; current or former owners; and officers, directors, employees, and affiliates; and the successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, disgorgement, unjust enrichment, and fraud.

8.      Subject to the exceptions in Paragraph 12 below, and conditioned upon EGS's full payment of the Settlement Amount, and subject to Paragraph 25, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), Relator, for himself and for his heirs, successors, attorneys, agents, and assigns, releases EGS from any civil monetary claim the Relator has on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733.

7

9.     In consideration of the obligations of EGS in this Agreement and the

Corporate Integrity Agreement ("CIA") entered into between OIG-HHS and EGS, and

conditioned upon EGS's full payment of the Settlement Amount, the OIG-HHS agrees to

release and refrain from instituting, directing, or maintaining any administrative action

seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as

defined in 42 U.S.C. § 1320a-7b(f)) against EGS under 42 U.S.C. § 1320a-7a (Civil

Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud,

kickbacks, and other prohibited activities) for the Covered Conduct, except as reserved in

Paragraph 12 (concerning excluded claims), below, and as reserved in this Paragraph.

The OIG-HHS expressly reserves all rights to comply with any statutory obligations to

exclude EGS from Medicare, Medicaid, and other Federal health care programs under 42

U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct.  Nothing in

this Paragraph precludes the OIG-HHS from taking action against entities or persons, or

for conduct and practices, for which claims have been reserved in Paragraph 12 below.

Notwithstanding the foregoing, in the event of Default as defined in Paragraph 4 above,

OIG-HHS may exclude EGS from participating in all Federal health care programs until

EGS pays the Settlement Amount as provided in Paragraphs 1 and 2 and reasonable costs

as set forth in Paragraph 4 above.  OIG-HHS will provide written notice of any such

exclusion to EGS.  EGS waives any further notice of the exclusion under 42 U.S.C.

§ 1320a-7(b)(7), and agrees not to contest such exclusion either administratively or in any

state or federal court.  Reinstatement to program participation is not automatic.  If at the

end of the period of exclusion EGS wishes to apply for reinstatement, EGS must submit a

written request for reinstatement to OIG in accordance with the provisions of 42 C.F.R.

8

§§ 1001.3001-.3005.  EGS will not be reinstated unless and until OIG-HHS approves

such request for reinstatement.

10.     In consideration of the obligations of EGS set forth in this Agreement, and

conditioned upon EGS's full payment of the Settlement Amount, DHA agrees to release

and refrain from instituting, directing, or maintaining any administrative action seeking

exclusion from the TRICARE Program against EGS under 32 C.F.R. § 199.9 for the

Covered Conduct, except as reserved in Paragraph 12 (concerning excluded claims)

below, and as reserved in this Paragraph.  DHA expressly reserves authority to exclude

EGS from the TRICARE Program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and

(f)(1)(iii), based upon the Covered Conduct.  Nothing in this Paragraph precludes TMA

or the TRICARE Program from taking action against entities or persons, or for conduct

and practices, for which claims have been reserved in Paragraph 12 below.

11.     In consideration of the obligations of EGS in this Agreement, and

conditioned upon EGS's full payment of the Settlement Amount, OPM agrees to release

and refrain from instituting, directing, or maintaining any administrative action against

EGS under 5 U.S.C. § 8902a(c) or 5 C.F.R. Part 890, Subpart J, for the Covered Conduct,

except as reserved in Paragraph 12 (concerning excluded claims) below, and except if

required by 5 U.S.C. § 8902a(b).  Nothing in this Paragraph precludes OPM from taking

action against entities or persons, or for conduct and practices, for which claims have

been reserved in Paragraph 12 below.

12.     Notwithstanding the releases given in paragraphs 7, 8, 9, 10, and 11 of this

Agreement, or any other term of this Agreement, the following claims of the United

States are specifically reserved and are not released:

9

a.     Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.     Any criminal liability;

c.     Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

d.     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.     Any liability based upon obligations created by this Agreement;

f.     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

g.     Any liability for failure to deliver goods or services due; and

h.     Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

13.     Relator and his heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the payment described in Paragraph 5, Relator and his heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C.

10

§ 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

14.    Relator, for himself, and for his heirs, successors, attorneys, agents, and assigns, fully and finally releases, waives and forever discharges EGS and its officers, agents, and employees, from any claim Relator has asserted, could have asserted, or may assert against them, including claims arising from the filing of the Civil Action, or under 31 U.S.C. § 3730(d) for expenses or attorney's fees and costs.

15.    In consideration of the obligations of Relator set forth in this Agreement, EGS for itself and for its partners, heirs, successors, transferees, attorneys, agents and assigns, releases Relator from any and all liability, claims, demands, actions or causes of action whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, under any federal or state statute or regulation or at common law or that it otherwise would have standing to bring against Relator.

16.    EGS has provided sworn financial disclosure statements (Financial Statements) to the United States and the United States has relied on the accuracy and completeness of those Financial Statements in reaching this Agreement. EGS warrants that the Financial Statements are complete, accurate, and current. If the United States learns of assets in which EGS had an interest at the time of this Agreement that were not disclosed in the Financial Statements, or if the United States learns of any misrepresentation by EGS on, or in connection with, the Financial Statements, and if such nondisclosure or misrepresentation changes the estimated net worth set forth in the Financial Statements by $250,000 or more, the United States may at its option: (a) rescind this Agreement and file suit based on the Covered Conduct, or (b) let the

Agreement stand and collect the full Settlement Amount plus one hundred percent (100%) of the value of the net worth of EGS previously undisclosed. EGS agrees not to contest any collection action undertaken by the United States pursuant to this provision, and immediately to pay the United States all reasonable costs incurred in such an action, including attorney's fees and expenses.

17.    In the event that the United States, pursuant to Paragraph 16 (concerning disclosure of assets), above, opts to rescind this Agreement, EGS agrees not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 180 calendar days of written notification to EGS that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on June 26, 2012.

18.    EGS waives and shall not assert any defenses EGS may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this Paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

19.    EGS fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and

expenses of every kind and however denominated) that EGS has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

20.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier), TRICARE or FEHBP carrier or payer, or any state payer, related to the Covered Conduct; and EGS agrees not to resubmit to any Medicare contractor, TRICARE or FEHBP carrier or payer, or any state payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

21.    EGS agrees to the following:

a.    Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of EGS, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)    the matters covered by this Agreement;

(2)    the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)    EGS's investigation, defense, and corrective actions

13

undertaken in response to the United States' audit(s) and

civil investigation(s) in connection with the matters

covered by this Agreement (including attorney's fees);

(4)     the negotiation and performance of this Agreement;

(5)     the payment EGS makes to the United States pursuant to

this Agreement and any payments that EGS may make to

Relator, including costs and attorney's fees; and

(6)     the negotiation of, and obligations undertaken pursuant to

the CIA to:

(i)     retain an independent review organization to

perform annual reviews as describe in Section III of

the CIA; and

(ii)     prepare and submit reports to the OIG-HHS

are unallowable costs for government contracting purposes and under the Medicare

Program, Medicaid Program, TRICARE Program, and FEHBP (hereinafter referred to as

Unallowable Costs).  However, nothing in paragraph 21.a.(6) that may apply to the

obligations undertaken pursuant to the CIA affects the status of costs that are not

allowable based on any other authority applicable to EGS.

      b.     Future Treatment of Unallowable Costs:  Unallowable Costs shall

be separately determined and accounted for by EGS, and EGS shall not charge such

Unallowable Costs directly or indirectly to any contracts with the United States or any

State Medicaid program, or seek payment for such Unallowable Costs through any cost

report, cost statement, information statement, or payment request submitted by EGS or

14

any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

          c.      Treatment of Unallowable Costs Previously Submitted for Payment: EGS further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by EGS or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. EGS agrees that the United States, at a minimum, shall be entitled to recoup from EGS any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

      Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by EGS or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on EGS or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine EGS's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

22.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 23 (waiver for beneficiaries paragraph), below.

23.     EGS agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

24.     EGS warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent following payment to the United States of the Settlement Amount.  Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to EGS, within the meaning of 11 U.S.C. § 547(c)(1), and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which EGS was or

16

became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

25.    If within 91 days of the Effective Date of this Agreement or of any payment made under this Agreement, EGS commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of EGS's debts, or seeking to adjudicate EGS as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for EGS or for all or any substantial part of EGS's assets, EGS agrees as follows:

a.    EGS's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547, and EGS shall not argue or otherwise take the position in any such case, proceeding, or action that: (i) EGS's obligations under this Agreement may be avoided under 11 U.S.C. § 547; (ii) EGS was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to EGS.

b.    If EGS's obligations under this Agreement are avoided for any reason, including, but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code, the United States, at its sole option, may rescind the releases in this Agreement and bring any civil and/or administrative claim, action, or proceeding against EGS for the claims that would otherwise be covered by the releases provided in Paragraphs 7 through 11 above.  EGS agrees that (i) any such claims, actions, or proceedings brought by the United States are not subject to an "automatic stay" pursuant

17

to 11 U.S.C. § 362(a) as a result of the action, case, or proceedings described in the first

clause of this Paragraph, and EGS shall not argue or otherwise contend that the United

States' claims, actions, or proceedings are subject to an automatic stay; (ii) EGS shall not

plead, argue, or otherwise raise any defenses under the theories of statute of limitations,

laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or

proceeding that are brought by the United States within 180 calendar days of written

notification to EGS that the releases have been rescinded pursuant to this Paragraph,

except to the extent such defenses were available on June 26, 2012, and (iii) the United

States has a valid claim against EGS in at least the amount of the Fixed Settlement

Amount and the United States may pursue its claim in the case, action, or proceeding

referenced in the first clause of this Paragraph, as well as in any other case, action, or

proceeding.

        c.      EGS acknowledges that its agreements in this Paragraph are

provided in exchange for valuable consideration provided in this Agreement.

    26.     Within seven (7) calendar days of the Effective Date of this Agreement,

the United States shall file in the Civil Action a Motion to Intervene.  Within fourteen

(14) calendar days of the order of the Court granting the United States' motion, and upon

receipt of the payment in Paragraph 6, the United States and Relator shall promptly sign

and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant

to Rule 41(a)(1).

    27.     Each Party shall bear its own legal and other costs incurred in connection

with this matter, including the preparation and performance of this Agreement.

28.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

29.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Montana. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

30.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

31.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

32.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

33.     This Agreement is binding on EGS's successors, transferees, heirs, and assigns.

34.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

35.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

36.     Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 2/19/14    BY: _____
SHAUN M. PETTIGREW
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: 2/18/14    BY: _____
LEIF M. JOHNSON
Assistant United States Attorney
United States Attorney's Office for the
District of Montana

DATED: 2/11/14    BY: _____
ROBERT K. DECONTI
Assistant Inspector General for
Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of
Health and Human Services

DATED: 2/14/14    BY: _____
PAUL J. HUTTER
General Counsel
Defense Health Agency
United States Department of Defense

DATED: _____    BY: _____
LLOYD V. WILLIAMS
Deputy Director for Federal Employee
Insurance Operations
United States Office of Personnel

20

THE UNITED STATES OF AMERICA


DATED: _____     BY: _____
                                 SHAUN M. PETTIGREW
                                 Trial Attorney
                                 Commercial Litigation Branch
                                 Civil Dvision
                                 United States Department of Justice


DATED: _____     BY: _____
                                 LEIF M. JOHNSON
                                 Assistant United States Attorney
                                 United States Attorney's Office for the
                                   District of Montana


DATED: _____     BY: _____
                                 ROBERT K. DECONTI
                                 Assistant Inspector General for
                                   Legal Affairs
                                 Office of Counsel to the Inspector General
                                 Office of Inspector General
                                 United States Department of
                                   Health and Human Services


DATED: _____     BY: _____
                                 PAUL J. HUTTER
                                 General Counsel
                                 Defense Health Agency
                                 United States Department of Defense


DATED: **FEB 1 0 2014**      BY: _____
                                 LLOYD V. WILLIAMS
                                 Deputy Director for Federal Employee
                                   Insurance Operations
                                 United States Office of Personnel

20

Management

DATED: 2/10/2014        BY: _____
                             DAVID COPE
                             Debarring Official
                             Office of the Assistant Inspector General
                               for Legal Affairs
                             United States Office of Personnel
                               Management

ENDOGASTRIC SOLUTIONS, INC. - DEFENDANT

DATED: 2-6-2014        BY: _____
                            ROBERT MICHAEL KLEINE
                            Executive Chairman
                            EGS

DATED: 2-7-2014        BY: _____
                            JONATHAN L. DIESENHAUS
                            Hogan Lovells US, LLP
                            Counsel for EGS

GLENN SCHMASOW - RELATOR

DATED: 2-5-2014        BY: _____
                            GLENN SCHMASOW

DATED: 2-5-2014        BY: _____
                            TREL D. CULVER
                            Counsel for Relator

21

**EXHIBIT A**

**FIXED SETTLEMENT AMOUNT PAYMENT SCHEDULE**

| Quarter | Payment | 3.25% Interest | Principal | Balance |
|---|---|---|---|---|
| | | | | 2,500,000.00 |
| 3/31/2014 | $120,000.00 | 20,312.50 | $99,687.50 | 2,400,312.50 |
| 6/30/2014 | $120,000.00 | 19,502.54 | $100,497.46 | 2,299,815.04 |
| 9/30/2014 | $120,000.00 | 18,686.00 | $101,314.00 | 2,198,501.04 |
| 12/31/2014 | $120,000.00 | 17,862.82 | $102,137.18 | 2,096,363.86 |
| 3/31/2015 | $130,000.00 | 17,032.96 | $112,967.04 | 1,983,396.81 |
| 6/30/2015 | $130,000.00 | 16,115.10 | $113,884.90 | 1,869,511.91 |
| 9/30/2015 | $130,000.00 | 15,189.78 | $114,810.22 | 1,754,701.70 |
| 12/31/2015 | $130,000.00 | 14,256.95 | $115,743.05 | 1,638,958.65 |
| 3/31/2016 | $143,900.01 | 13,316.54 | $130,583.47 | 1,508,375.18 |
| 6/30/2016 | $143,900.01 | 12,255.55 | $131,644.46 | 1,376,730.72 |
| 9/30/2016 | $143,900.01 | 11,185.94 | $132,714.07 | 1,244,016.65 |
| 1/3/2017 | $143,900.01 | 10,107.64 | $133,792.37 | 1,110,224.28 |
| 3/31/2017 | $143,900.01 | 9,020.57 | $134,879.43 | 975,344.84 |
| 6/30/2017 | $143,900.01 | 7,924.68 | $135,975.33 | 839,369.51 |
| 10/2/2017 | $143,900.01 | 6,819.88 | $137,080.13 | 702,289.38 |
| 1/2/2018 | $143,900.01 | 5,706.10 | $138,193.91 | 564,095.48 |
| 4/2/2018 | $143,900.01 | 4,583.28 | $139,316.73 | 424,778.75 |
| 7/2/2018 | $143,900.01 | 3,451.33 | $140,448.68 | 284,330.07 |
| 10/1/2018 | $143,900.01 | 2,310.18 | $141,589.83 | 142,740.24 |
| 12/31/2018 | $143,900.01 | 1,159.76 | $142,740.24 | (0.00) |
| Total | $2,726,800.09 | $226,800.09 | $2,500,000.00 | |

22